Three cases. The first case is United States of America v. Anthony Andrews, case number 17-2078. Counsel for Appellant, how much time would you like to reserve for rebuttal? Good morning, Your Honor. I'd like to reserve three minutes for rebuttal, please. Sure, we can do that. Thank you. May it please the Court, Mary Kate Healy on behalf of Appellant Mr. Anthony Andrews. I would like to focus on Mr. Andrews' particularity argument. Here, the warrant violated the Fourth Amendment because it failed to identify the particular apartment to be searched in a multi-unit dwelling. The agent's execution of the warrant was unreasonable, and the good faith exception does not apply. Was the execution raised in front of the District Court? Yes, Your Honor. This was raised? Yes, Your Honor. Is that who you briefed Garrison? Yes, Your Honor. Trial counsel argued that the warrant was invalid, and at the suppression hearing, trial counsel called Ms. Sheila Andrews, Mr. Andrews' mother to testify and put in evidence about the interior of the apartment, what the internal condition that would have alerted the officers to the multi-unit nature of the dwelling. What about the three doorbells? The District Court made a big point of the fact that there are no names on the doorbells, including Ms. Andrews' name was not on the doorbells. Why was that unreasonable when the District Court concluded that the police could reasonably conclude that only one person or one, it was basically serving the purpose of a single unit dwelling, you know, with a multiple dwelling unit? Your Honor, I'm sorry, I believe I misheard. The mail, the drop box, the mailbox, why it was unnamed? Well, no, the doorbells, not the mailbox, the doorbells. The doorbells, I see, okay. Well, first, yes, the doorbells were unlabeled, but there were three of them. They were clearly visible on the side of the front door. Also, here the officer, Special Agent Wesko, testified that he reviewed a law enforcement database, the accurate records, and also City of Philadelphia records, and both of, to determine that Mr. Andrews was associated with the property. Both of those records indicated that the property was a multi-unit dwelling. The accurate records revealed 15 entries for individuals who had lived at the property over the years, including some in the time frame where they were executing the search warrant. Those entries indicated that people lived in the building on various floors and apartments, and the City of Philadelphia records indicated that the property was a converted row home, a three-story apartment building, a triplex. But we also have the agent's observations, which suggest the opposite. The agent's observations suggest that you only have two people, basically, in and out. So I guess my question for you is, when we have the agent's observations and you have the tax and accurate records, which one should be given more weight? Thank you, Your Honor. I think that we have the agent's observations as they are put forth in the affidavit, but the government rested on the four corners of the affidavit. They never called the agent to testify at the suppression hearing, and the district court determined that it was reasonable for the observations to outweigh the records. But I think that the district court gave the affidavit too much credit because the officer never testified or never swore in his affidavit, for example, that he never saw other people at the property. He just talked about the two people who were the target of the investigation. And that is a little strange because we learned later that the agents did conduct a protective sweep of the house, right? That comes out at trial. Correct, Your Honor. And so if they did a protective sweep of the house, maybe they would have seen three kitchens, three bathrooms, one on each floor. And so it strikes me as a little, maybe there was strategy in not having an officer testify, at least by the government. I suppose that Mr. Andrews could have subpoenaed an agent to testify at a suppression hearing. It might have been an unusual move. But if the question would have been, did you see three kitchens? You know, we're done. You're a witness. Maybe that would be interesting if they did a protective sweep. So I guess my question is, is there any inference that we can make from kind of the coupling of the mother's testimony with the agent's protective sweep to say, hey, they had to know when they were there on the scene that this was multi-unit? Or is that too much in the affidavits really where the focus is? I think this court can look to the trial record to supplement the suppression record, I believe. How can we do that? Because at the time the judge ruled, none of that information was in the record. And if we look to the trial record, one, it may help you. One, it may also hurt you. I don't know. But I'm just wondering how we get past the four corners. If that's what the government relied upon, wasn't the district court stuck with the four corners as well as the defendant's mom who testified, and that's what the ruling had to be based upon? Yes. I think that is what the government relied on at the suppression hearing. And certainly this court in the past has held the burden, held the government to what it decided to represent at the suppression. And at the suppression hearing, the government had the burden of showing that the execution of the search was reasonable. And they chose to meet that burden by relying on the four corners of the affidavit. So if I'm incorrect, you can look to the trial, and certainly they would be limited to the four corners of the affidavit. So can I ask a follow-up question about just particularity, just the law of particularity? So we've got this one rule that says, if you have a warrant to search a multi-unit building and you only need to search one unit, then your warrant is overbroad, general warrant, not particular. But there seems to be an exception to that. If the occupant of a multi-unit dwelling has control and maybe access, but at least control over the sum total of the building, then it seems that the particularity concerns dissipate a little bit. Is that right? I do not think that's right, Your Honor. And I don't think, I think here it is likely an academic exercise because there's no indication that Mr. There's no evidence in the record that he could have, that he occupied either of the other two. And even if he had access to them, his mother owned it, they don't appear to be locked. There's no evidence that the other units are locked. And so, or even subject to, you know, it says just different floors. So I guess if he did have, but I guess the question is, if he did have control, the academic question, right? If he did have control over the whole unit, it's not a particular warrant. Now, maybe it's a factual question as to what the record shows. Did he have such control? But, but is it, but on the academic question, what do you think? No, I think that still the law enforcement officers would have needed to establish probable cause that he had access to one of the three units or, or each of the three units if they wanted to search all three of them. And I, so I think first the, the warrant was invalid because at the time, this is not an, this is not a situation where the officers later discovered information that, you know, we're not looking with the benefit of hindsight. When they got the warrant, they knew at least that the accurate records indicated that there were multiple tenants and they had other external indicia, the doorbells, two front doors that should have alerted them to the fact that this was a multi-unit dwelling, albeit we later learned without other tenants at that time. Did they know about the two front doors before they served the warrant? I'm sorry, Your Honor? Did they know about the two front doors before they served the warrant? I thought that wasn't visible from the street while they were surveilling. Your Honor, in the search warrant affidavit, I believe that Special Agent Wesko identified both. He identified the front door and then a smaller door. And I don't think he identified it as a basement, but as a second door. I will confirm that. And to your point earlier about the three doorbells then being unlabeled, in Williams and in Kyle's, those cases involved officer testimony where the officers said they didn't observe the doorbells. And so I don't think that the fact that they were unlabeled, we don't know whether the officers here, whether they saw the doorbells, whether they ignored the doorbells, whether that couple we just have a lot of questions, frankly, because of how the government chose to proceed at the suppression hearing. Does that go to the doorbell issue? Does that really go to the particularity issue or the execution issue? Because don't we have the testimony, don't we have testimony that the doorbells are on the inside of the door such that you can't see them on the outside? The doorbells are on the door jam. And so they are on the exterior of the house facing outward. The government argued that they were not visible from, I think the government may mention that the officers were concerned about revealing their surveillance. And those facts that you just said, the government may mention about the officers, where do those facts appear? Do they appear in the suppression record or are they in the government's briefs? They're in the government's briefs. So the government argued those facts, but they're nowhere in the record. And the affidavit doesn't talk about fearing for, fearing that they would be revealed during their surveillance. And the surveillance here is really pretty weak. The district court made a big mention about the fact that it occurred over several days, but it wasn't the type of consistent surveillance that would, there wasn't a poll camera. There was not a stakeout. This was a couple of hours on a couple of days. That's not the type of, that's not the type of surveillance that would adequately determine whether or not an apartment that they had reason to believe had multiple occupants, had people living on different floors to determine that that's a single family residence. I don't get the whole thing with the surveillance. They had him at the gun range possessing a weapon. And it's like they wanted it to be Joe Friday and said the surveillance and play super cop or something. There's so much about this case that I just don't get. And that's one of them. They may have outsmarted themselves with this. I don't know. They may have what? I'm sorry. They may have outsmarted themselves with the way they put this case together. So I think first on the validity of the warrant, there are reasons that this, that the officers knew or should have known when they executed the warrant that the property was a multi-unit building. I then think when you move towards the execution of the warrant, the officers did not reasonably execute the warrant here. Is there anything in the suppression hearing about the execution of the warrant at all? No, Your Honor. No. And I think that that draws against the we later learned at trial was not present for the search. And so she testified about the nature of the property, but she couldn't testify about the, about how the search was executed. And I think this is a case, you know, similar to this court's opinion in Ritter. Once the officers realized, if they realized, and I think there are a lot of questions on this but. So even if all of that's true, we, you know, the exclusionary rule is not automatic. And so don't you have to kind of show that this would be a good case to apply the exclusionary rule as well? And that would mean you'd have to show something like recklessness or gross negligence on behalf of the officers. And then kind of a balancing of just a lot of kind of a culpability, things like that. Where are you on the exclusionary rule? Let's say, let's, let's say there is a deficiency in either the warrant or its execution. Good, but exclusionary rule is not automatic. The exclusionary rule is not automatic, but I think anytime you're assessing the, whether it should apply first, the nature of the constitutional interest at stake here, this is the home. The home enjoys pride of place in Fourth Amendment jurisprudence. It is the first among equals. The Supreme Court has repeatedly said that and made it clear. But, and here you have, at least you have officers who should have known that the, that the property was a multi-unit dwelling when they got the warrant. If they did not know when they executed the warrant, they should have realized. I think that there was, you know, there are three apart, there are three kitchens, there, there are three bathrooms, there are internal indicia. They should have realized it was not sufficiently particular. And so it seems to me that kind of this, this theory on the exclusionary rule is like an accumulation theory. Like, you know, we had, we had problems, you know, with particularity, would have been nice for the officers if it was just the second floor or whatever floor it was. And then we realized when they're executing, there was other kind of indicia, other problems. And maybe your point is, although we might be able to overlook not checking or not realizing from the zoning records what it is, and although we might be able to say, hey, there's 15 residents, not all of them are from a likely timeframe. Some of them have no floor number. Those feel like normal negligence sort of things, or at least could be viewed as normal negligence sort of things. We've got cases that say misreading a database is normal negligence. Supreme Court says misreading a database is relying on a database. Erroneous entry is just negligence. I think that's herring. But what you're saying, I think, depends on kind of our ability to aggregate and accumulate all these things. Is that right? Not any individual one of them rises to the level of reckless. Are you saying that every single one of them is independently reckless? In terms of what the officers ignored or did not realize? For purposes of the exclusionary rule, to kind of assess this kind of degree of culpability assessment for purposes of the exclusionary rule? I think certainly in the aggregate, the exclusionary rule should apply. But I also think on this record, we don't have sufficient information about what the officers saw or how they executed the warrant to give. I think that if you did not apply the exclusionary rule in this context, I think that agents could continue to say, well, the city records or my law enforcement database says that this is a multi-unit dwelling. But based on a few hours of surveillance, I disagree. And therefore, I'm going to search the entire property. And I think that is behavior that we should deter. And the exclusionary rule is designed to deter. Let me ask you one quick question. If we hold that the government has not carried its burden to show that the search was reasonably executed, do we need to reach your constructive amendment or sufficiency of the evidence arguments? No, Your Honor. Thank you. We'll hear from you for three minutes on rebuttal. I'll hear from counsel from Pelley. Good morning, Your Honors. May it please the court. Ruth Mandelbaum on behalf of the United States. On July 17th, 2014, law enforcement officers reasonably executed a valid warrant at 4311 West. In the world was reasonable given garrison when they got to the property. They had to have known or at least reasonably suspected that there was more than one year inside that property, inside 4311. Doesn't garrison require them at that point to stop as opposed to going in? And if that's not true, then once they got in, they had further indicia of a multiple unit dwelling because they've got separately metered utilities right there on the wall. I just don't understand, based upon this record, how the search was reasonable. And I know I assume you went to trial attorney. For whatever reason, I think I can guess at why the trial attorney decided to rest on the affidavit and not put on the police officers. And you're stuck with that. You're stuck with the record, the lapses of record. And it seems to me almost like in the old, that I think Judge Ruggister used this example one time, Judge Alderser, rather, of the circus hand with the shovel comes along behind the elephant. You're kind of asking us to come along behind the elephant now and clean up the mess that was made because you rested on the four corners of the affidavit. So first, Your Honor, I don't think I would automatically assume. I will agree that the failure to introduce more evidence at the suppression hearing was probably not the best move on the government's part, but I would not automatically assume that it was intentional rather than just the trial attorney's understanding of at a suppression hearing, you rest on the affidavit and not a further analysis. I've conducted many, many, many suppression hearings. I never dreamed of resting on the affidavit, but I always had reliable agents that I could put on the witness stand that I didn't have to worry about the cross. And I don't want to get into that by getting between the lines. I understand. And I will just briefly defend Special Agent Wesko, who was a special agent at the time of this warrant for 25 years at the ATF, testified reliably at trial. But I'll get back to a reasonableness point, which is what I think you're actually getting to. How do we know that the search was executed reasonably under garrison? Based on what was in the record at the suppression hearing. Based on what was on the record in the suppression hearing, Your Honor. And garrison only applies if the residence that was searched was, in fact, a multi-unit residence that was occupied by multi-families. The district court found that based on the record at the suppression the district court found that 4311 Westminster was actually a single family residence at the time the search was executed. Well, I want you to take me back to garrison, actually. You said that garrison holds that garrison only applies if it was actually occupied as a multi-family unit. Can you point me to exactly where in garrison it says it must be occupied as a multi-family? Well, I think it's whether it's failure to recognize the over breadth of the search warrant. And the search warrant is only over broad, as Judge Phipps alluded to earlier, if the person whose belongings and area you're attempting to search doesn't have access to the entire property. No one else's privacy interests were at interest here because there was no one else in that home other than Mr. Andrews and his girlfriend. Access or control? Either. Either. And what case refers to access? I'm not sure, Your Honor, whether access is referred to in garrison. However, there is the Brooks case in the Fourth Circuit. It's a 2008 case where it's pretty much the same situation. There were two units. The top unit had been vacant for four months. The defendant was in, I believe, the bottom unit. And it was reasonable to execute the search without stopping the search because there was no indicia that there was someone else living in that top unit. And so, I mean, maybe the line between access and control for vacant units is a very, it's not a big line. It might be a very big line for occupied units. But maybe access to vacant units, access really does almost double as control. And you could maybe, it's not entirely unreasonable to assume that a person with access to all three floors might hide contraband not farther away from where they like to live. That just might be a better hiding place. I don't know. But, I mean, we still have this kind of deep, I think, question of particularity. We have a general rule that says if you have a multi-unit dwelling and you only want to search one of the three floors, you have to stop the search. And so, it feels that you fit into that unless you've got some sort of exception to that general rule. But that's been our general rule for a long time. Under Ritter, the rule is if you have a multi-unit dwelling. And when it was reasonable, objectively, for the officers to conclude that it was a multi-unit dwelling, you either have to stop the search or you have to only search the unit you have probable cause to search. The district court here, and you were... You said we're only obligated, you're obligated to either limit the search to the areas clearly covered by the warrant or to discontinue entirely the search. Correct. So, if the warrant is overly broad and doesn't, isn't limited at all, what would be the area that's clearly covered by the warrant? So, I read that, and perhaps you read it differently, Your Honor. I read that to say the area that the officers, that the warrant was directed to. In this case, this warrant, not on the face of the actual warrant, but when read in conjunction with the probable cause affidavit, it's clear that what they are looking to search here is Mr. Andrews. The area he has in his control probably... That's exactly the problem. Because when they get there, they have reasonable notice that, wait a minute, this is not a situation where only Andrews and or his girlfriend, you can make a very strong argument that the extent that his girlfriend was co-occupant, that doesn't really matter because of what the officers observed, and that both of them may have been living there. But the officers around notice, it seems to me, that it was more than one unit, i.e. more than Andrews and his girlfriend. Under Garrison, at that point, they, it seems to me, they have to stop. What you're arguing is that information that came to their attention after that But I'm not sure that that information goes into the calculation under Garrison. That's my problem. Well, I think the question is when it would have been reasonable for them to determine that it was a multi-dwelling unit. The district court... But that's why it's by the three doorbells. Isn't that enough? The district court found that it was not enough. I know, but that doesn't bind us. The district court found it was not enough. We're not bound by the district court determination, obviously. Why wouldn't going up to a building that you think is a single unit dwelling, it's in the affidavit, you see three doorbells there, you can go beyond that and you structure the doors inside, but you see three doorbells. Why isn't that enough to put you on notice to say, wait a minute, we may have a problem here? The fact there are no names on the doorbells means nothing to me. I mean, there's a lot of reasons why people would not want to put their name on a doorbell in certain parts of the city, especially. That seems to me to be a wise and prudent move. So I'm not at all persuaded by the district court's emphasis on the fact that there are no names on the doorbells. Somebody lived there. So I will say the district court's decision is not binding on you, but you do review his factual conclusions for clear error. He was the one who heard the testimony at the suppression hearing. So that is the standard of review here. He did not only rely on the fact that there were not names on the doorbells. If you look at a picture of the doorbells, and that's in the record at Appendix 181. These are not uniform doorbells. These are not doorbells that look like they were all installed at the same time. We're not talking Chestnut Hill here or Scarsdale. The fact that these went out pristine, the designer doorbells, doesn't cut it. I mean, they were doorbells. Not everybody can afford to go to Hummacher Schlemmer and get a $500 doorbell and make sure it matches the doorbells that your neighbors have. Well, we won't talk about how many non-functioning doorbells are in my home, which is unfortunately more than one. But the question is whether the district court clearly erred when he concluded that it was not reasonable at that time for the officers to automatically realize or to believe that it was a multi-unit dwelling at that time. So what about this notion of just kind of aggregate officer error when it comes down to let's just say that these errors were a problem crossing the line into the Fourth Amendment. Well, what about the role of aggregate officer error when we talk about looking at the exclusionary rule and whether it should be applied? Well, I do not believe that there was any sort of recklessness or anything that rises above the level of negligence at any point or even in aggregate here. But assuming that you find that, which I do not think is the case, I do think that the court can look at aggregate error when applying the exclusionary rule. But I also think it's important to look at what actually happened here. They went into a home where they had probable cause to believe that Mr. Andrews and his girlfriend were storing firearms. They searched and seized items only from the bedroom. So don't we have to stop there? Going back to the suppression hearing, what do we have at the suppression hearing? There are a few things I want to talk about. Going back to your access point, you talked about Mr. Andrews having access to the entire place. You talked about them only seizing guns now from his bedroom and then limiting their search to his area. What from the suppression hearing, what from the record of the suppression hearing can I point to if I were writing an opinion to say what you just said? What from the suppression record can I cite for any of the points that I just mentioned? So you can cite for the fact that there was no one else in the home, there were no other occupants in the home, Ms. Andrews' testimony at the suppression hearing. But how does that tell me he had access to the other units? What does that tell me about whether or not the doors were locked? What does that tell me about whether or not he had access to the other units? So again, the question is whether the district court had clear error when determining that the doors were not locked, and this is how he got there. He looked at Ms. Andrews' testimony where she described in detail the outline of what the home looked like. He walked into the front door, there were multiple doors to the first door, to the first floor apartment. He walked up to the second floor. But to the first floor apartment or to the first floor? Were there multiple doors to the first floor apartment or to the first floor, or was that the same thing? So you walk through two doors, she described, and this is, she describes in detail mostly on Appendix 152 to 153. But once you get in kind of those front doors, you see a staircase, and there's an image of that in the record. And there are two doors on the first floor. Those doors, in her words, both give access to the first floor apartment, right? But there are clearly just two doors. You go up to the second floor. I believe she said there are three doors on the second floor, as you would have in a single-family home. One goes to a bathroom. One goes to what she calls is the second floor apartment. And then you walk up to the third floor, and there are three more doors up there. One that goes to a bathroom. One that goes to the presumably bedroom on the third floor. So there was a lot of detail in the record about what this house looked like. And it would have, and she testified at length about what doors were there, what doors were locked. She talked about how the front door was locked. The second door, once you got in, was locked. She did not discuss whether all these, in my count, eight doors that are internal in the house that lead to these various different rooms that she's calling apartments had locks on them. But the district court judge concluded, based on what he heard in the record, that it was likely that they did not. And again, it is not only whether Mr. Andrews had access to all these rooms. It's whether there was anything in those rooms and around those rooms to indicate that it was not being used as a single family residence at that time. We know no one else was living there. It was reasonable for the district court to conclude, and it was not clear error for him to conclude, that when you walk around an empty bedroom, when there's only one bedroom that's occupied in a residence, that there's only one family living in there. And there is a case out of a different circuit that also discusses the fact that if there's only one bedroom, then it's reasonable to believe it's a one family unit. And that's Clumpton out of the Sixth Circuit. So can we consider the fact that the police, that we know from trial that the police made a protective search to it in any way in our analysis? Does that go into maybe an assessment of clear error? Or are we just going to evaluate the suppression hearing on its own without any kind of peak that would happen at trial? Because it would suggest to me that if they conducted a protective sweep of the house, that might be that they went into more than one of these eight interior doors. But is that just outside of the bounds of what we can consider? When you're considering the district court's findings, factual findings for clear error, I think you have to cabin yourself to the suppression record. If you're taking a broader look at this case and determining whether there was good faith in the way that the officers executed the warrant, I think perhaps you can look at a broader record. And the reason I say that is because it's important in every case to get the facts right. But it's especially important when you're applying the good faith exception for all the reasons that were discussed earlier. It is to deter officers. And if excluding evidence will not serve a deterrent effect, it comes with a lot of potential societal harms. Why wouldn't it serve a deterrent effect here? We'd basically be saying to officers, look, if you're in a situation where you have probable cause to go into a property and you believe it to be a single unit dwelling, you get to the outside of the property and you have reason to believe that, wait a minute, we're wrong. More than one occupant this year, this is a multiple unit dwelling. Why wouldn't that be in the public's interest to say to the officers, stop that search? You've got to do further investigation, which they could have done at this point. But you can't go in and serve the warrant generally now that you know that this could be a multiple dwelling unit. I see that my time's up. May I respond, Your Honor? So it would be, to get to that point where you have to determine whether it would have a deterrent effect, you would have to conclude that the officers recklessly or consciously looked in and said, hey, look, this is, our warrant's too broad. But, and despite the fact I see no one else in this house, despite the fact whether or not I saw those doorbells, whether or not I saw anything else, I believe now at this point in time that there are other privacy interests at stake and you know what, to hell with it, I'm going to search the entire house. And that just is not the case of what happened here. They went in. They expected to find two people. There was no indicia that anyone else was living there. They searched the area. And the subject that they had probable cause clearly to search and the subject of the suppression motion is the four firearms that they found in that bedroom, occupied by Mr. Andrews and his girlfriend. Thank you very much. Thank you all. I think you reserve three minutes. Thank you, Your Honor. I have three quick points. First, I think on the question of access and control, the government is really trying to have it both ways. On the one hand, they're arguing that the agents limited their search while there's no evidence in the suppression record that they did so. That would support a conclusion that Mr. Andrews did not have access to the entire property because they limited their search. I don't think the record supports that they limited their search at the suppression. And so I think on that point, the search warrant was overbrought and their execution was unreasonable. Second, on the exclusionary rule, when you're assessing what the agents did here, they took sporadic surveillance. They got database records that said other individuals lived at this apartment and on different floors in different apartments. They ignored that. They had a city record that said it was a converted row home into a three-story apartment triplex. They ignored that. What record did that come from? What was the source of that? Excuse me? What was the source of that record? It was the government attached to their sentencing memorandum the affidavit and the records that the law enforcement officer reviewed, which I believe the district court concluded. That wasn't the accurate record check, was it? Where did they get that information? It was a tax record, right? I believe so. It's a city of Philadelphia records. And there's a footnote in the district court's memorandum opinion saying it's not entirely clear where they come from or how to interpret them. And I think any of those, any of that uncertainty cuts against the government. Was that a record that said this has been converted or was it a zoning record? Was it a zoning notation? Your Honor, I did believe that it said that it had been converted. If I am incorrect, I apologize for that misrepresentation. And it's possible that I was, it's not labeled. So it says row converted apartment, three-story masonry. And then on the second page, floor plan triplex converted. And so I think the exclusionary rule can, in the aggregate, address the officers. I think some, I think these are individually sufficient, but in the aggregate certainly warrant the application of the exclusionary rule. And the government briefly mentioned societal harms. But Mr. Andrews has been serving a 10-year sentence. He'll be released in three months. And if the evidence should have been suppressed, he certainly has suffered a harm. But that is a societal harm as well. So I believe that, I think that's all that I have. But I'm happy to answer any other questions if the panel has any. Because I'm looking, I just did Google Maps with the advantages of that done with paper. And looking at the property, I mean, going back to the doorbell. I mean, the surrounding properties, there are windows missing and everything else. It's a wonder there were any doorbells on the doorjamb, let alone three that weren't in immaculate repair. But that's just as an aside. It's neither here nor there. Thank you, Your Honors. Thank you very much.